CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
11/13/2024
LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE SEIZED FROM JAKAYLA CALLOWAY, PRESENTLY IN THE CUSTODY OF THE LYNCHBURG POLICE DEPARTMENT AS ITEM 1 UNDER REPORT 2024-016724 | Case No. __6:24mj38__<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Matthew Knabb, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") and have been such since 2022. I am also a Detective with the Lynchburg Police Department ("LPD") and have been so employed since 2014. I was previously employed as a Police Officer with the Virginia Beach Police Department from 2006 to 2014. Since 2017, I have been assigned to investigate firearms violations, drug trafficking crimes, and violent gang activity as a member of the LPD, and later the ATF, Washington Field Division/Roanoke District Office. In investigating these matters, I have acted as case agent, undercover agent, and contact agent for confidential sources. In past investigations, I have employed search and seizure warrants, often resulting in indictments and criminal convictions for violations of state and federal law.

3. During my time as a law enforcement officer, I have received numerous hours of training in narcotics, firearms, explosives, and gang investigative techniques. I have received advanced training as a firearms instructor, explosive breacher and handler, and police counter-sniper. I have received basic and advanced training in several disciplines including Special Weapons and Tactics and undercover operations. Through the course of my duties, I have personally led and participated in numerous criminal investigations related to drug trafficking, criminal gang activity and firearms offenses, and testified as an expert witness in each. I have dealt directly with informants, suspects, and defendants, including experienced narcotic traffickers, about the methods and practices of drug dealing. This includes the methods and practices used by traffickers of methamphetamine, marijuana, heroin, fentanyl, and cocaine. I am familiar with how traffickers operate; in particular, how they communicate, and how they distribute, store, and transport illegal narcotics. I am also familiar with how traffickers collect drug proceeds and launder those proceeds.

4. Based on my training and experience investigating drug trafficking, I am aware that individuals engaged in buying and selling illegal narcotics use cell phones, including voice and text messages, to execute their crimes. I know that "smart" phones play an integral role in drug trafficking and that dealers use cell phones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and telephonic conversations. I also know that it is common for narcotics traffickers to use multiple phones, including phones belonging to individuals other than themselves, to communicate with co-conspirators, to compartmentalize their illegal activity, and avoid detection by law enforcement.

5. The facts in this affidavit come from my personal observations, training and experience, and information obtained from other agents and witnesses. This affidavit is intended

2

to show that there is probable cause for the requested warrant and does not set forth all my knowledge about this matter.

6. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Jakayla CALLOWAY and others knowingly used communications facilities with the intent to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b), and conspired to distribute and possess with intent to distribute fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. There is probable cause to search the information described in Attachment A for evidence of these crimes, as further described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7. The property to be searched is an Apple iPhone of unknown serial number, seized from Jakayla CALLOWAY as item 1 under LPD report number 2024-016724, hereinafter the "Device." The Device is currently in the custody of the Lynchburg Police Department headquartered at 905 Court Street Lynchburg, VA 24504.

8. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9. In October of 2023, the Lynchburg Police Department ("LPD") began investigating Tremon Burford, also known as "Set," or "Set Right," in relation to the distribution of pressed fentanyl pills in Lynchburg, Virginia, within the Western District of Virginia. Burford was incarcerated at the Blue Ridge Regional Jail in Lynchburg. Recorded communications from the jail showed that Burford was coordinating the activity of a drug trafficking organization (DTO) by directing the actions of co-conspirators outside the jail.

10. Burford is a convicted felon with a lengthy criminal history that includes multiple prior convictions related to drug trafficking. Burford's criminal history includes gang participation, possession of a firearm by a felon, eluding, failing to stop for police, distributing cocaine (x3), possession with intent to distribute Schedule I/II controlled substances, distribution of imitation controlled substances, and possession of Schedule I/II controlled substances.

11. I investigated Burford in the fall of 2020 for suspected drug trafficking and gang participation. On December 3, 2020, I facilitated a traffic stop on Burford in Lynchburg, VA, after he was observed leaving his residence at 853 Brooke Street. Burford fled from law enforcement and eventually crashed his car on Lakeside Drive. He then fled on foot. A firearm was recovered from the scene of the crash, which was attributed to Burford. In July 2023, Burford was convicted by a Virginia jury of possessing a firearm as a convicted felon and participating in a gang stemming from this incident. The Lynchburg Circuit Court sentenced Burford to six years of active prison time.

12. Between his arrest in December 2020 and his conviction at trial in May 2023, Burford remained in pretrial custody at the Blue Ridge Regional Jail.[1] Following his trial, he remained in custody there pending designation to a state correctional facility.

13. Between October and November 2023, law enforcement learned that Burford was engaged in narcotics trafficking while incarcerated. Utilizing several forms of communication including recorded jail calls, recorded jail video visits, and recorded jail text messages, Burford appeared to be facilitating drug sales and money transfers with co-conspirators outside of the jail including Jasmine ("Jaz") Berger, INDIVIDUAL 1, and INDIVIDUAL 2.

---

[1] A previous search warrant affidavit noted that the conviction was in July 2023. *See* Case No. 6:24-mj-25, Aff. ¶ 11. This was a scrivener's error: Burford was *sentenced* in July 2023.

14. The evidence gathered led to the issuance of multiple state search warrants. On November 28, 2023, the LPD executed a series of search warrants in Lynchburg, VA. Those warrants included the residences of Berger, INDIVIDUAL 1, and INDIVIDUAL 2, along with Burford's jail cell. Law enforcement also searched a bank deposit box maintained for Burford's benefit at a local Wells Fargo branch.

15. The search warrant of INDIVIDUAL 1's residence yielded more than 8,000 tablets of pressed blue tablets, labeled as Percocet M30s. These pills were found in INDIVIDUAL 1's bedroom closet. They were later tested by a laboratory and found to consist of more than 900 grams of a mixture and substance containing fentanyl, a Schedule II controlled substance. INDIVIDUAL 1 admitted knowing that her house contained controlled substances in statements made after receiving *Miranda* warnings.

16. Police also seized INDIVIDUAL 1's cell phone pursuant to the search warrant. The phone contained substantial evidence of drug trafficking, including text messages and ledgers kept in the phone's "Notes" section. One such note was entitled "Tremon's Money." Drug-related text messages pertaining to Berger, INDIVIDUAL 2, and other individuals were also found on the phone. Law enforcement also searched the residences of Berger and INDIVIDUAL 2 and seized a cell phone from each individual, pursuant to search warrants.

17. The search warrant of Burford's jail cell led to the seizure of handwritten notes made in a paperback book. Numbers handwritten in the book corresponded to numbers discussed in recent drug-related conversations involving Burford. Law enforcement conducted a post-*Miranda* interview of Burford, and Burford admitted to facilitating the sale of pressed fentanyl pills from within the confines of jail. Burford claimed that Berger, INDIVIDUAL 1, and INDIVIDUAL 2 did not have any knowledge about his activities and claimed to be solely

responsible. This claim did not appear to be credible, given other information detailed in this affidavit.

18.  Further review of recorded jail communications and text message communications from INDIVIDUAL 1's phone indicated that Burford's sister, Jakayla CALLOWAY, was another co-conspirator in the Burford DTO. Law enforcement located drug-related communications between Burford and CALLOWAY, and between INDIVIDUAL 1 and CALLOWAY.

19.  Law enforcement reviewed jail communications between Burford and CALLOWAY going back to February of 2023. Burford communicated with CALLOWAY through recorded jail calls, as well as recorded jail text messages. I reviewed messages that appeared, in my training and experience, to pertain to the storage, packaging, weighing and distribution of controlled substances, US currency, by co-conspirators including INDIVIDUAL 1 and Berger. Some examples listed are as follows:

   a. On February 5, 2023, Burford wrote to CALLOWAY: "And you need to put that bitch jaz out too frfr. Shawty be on some weird as shit. Yo… And don`t let her mess w my shit either sis, get my stuff and ima get *[INDIVIDUAL 1]* to grab it. I know I been through this before but I sweasr too god on my grnadma and my freedom I`m done w her frfr. So make sure you get that , frfr ask her can yo grab it now , so I know she ain`t gone try do no bs like last time". CALLOWAY then replied "Ok & don`t be giving your stuff to just anybody, who is *[INDIVIDUAL 1]* [.]"

   b. The next day, on February 6, 2023, Burford wrote to CALLOWAY: "Ay sis , let jaz fix them joints up for me and then I`m get *[INDIVIDUAL 1]* to grab em. Jaz said sheon mind fixing em so let her do that for me and then get the joint back and put it up please along w my key to my car[.]" CALLOWAY responded: "Okay[.]"

6

c. On July 11, 2023, Burford wrote to CALLOWAY: "I need you to take a pair of them shoes that my white boy be getting for his kids and make 8 pair of kids 3.5`s[.]"

d. On July 15, 2023, Burford wrote to CALLOWAY: "Ima get *[INDIVIDUAL 1]* to bring you some more clothes for my white boy and pick the outfits up that you already put together for the week. So give her what you got and she gone replace it . just swap out, love you[.]"

e. On August 4, 2023, Burford wrote to CALLOWAY: "Ay sis, when jaz get bck she gone bring u the shit I had at her crib so *[INDIVIDUAL 1]* can grab em . she gone give you 2 blue shirts that hasnt been opened yet. She gone give you 16 pair of shoes that`s already laced up and my cardier glasses, so please make sure allat is there sis. Copy and paste this in your notes so youl know what to expect n look for. So that a whole 2 not open and 16 did up and separated and my glasses sis make sure you double check n I got 200 for you to make sure its all there[.]"

f. On September 30, 2023, Burford wrote to CALLOWAY: "Wassup n Good morning lil butt. When *[INDIVIDUAL 1]* hit you n slide through , give her 2 pair of them 7 shoes I got at yo house please n thank you. Love you hope you have a great day[.]"

g. On October 4, 2023 Burford wrote to CALLOWAY: "Jaz gone bring you them shoes for mike. Text him for me n ask when was the last time he went hollered at her just in case she did some sneaky shit[.]"

h. On October 22, 2023, Burford wrote to CALLOWAY: "Text my cousin Tyler *([redacted phone number])* n tell him not to give shawty no more joints or bread

7

as of now. I`ll hit him myself if something changes. And did she ever come through yesterday?! Or today?! And if not then don`t give her noting else till he hear from me personally[.]"

i. On October 31, 2023, Burford wrote to CALLOWAY: "Ay sis, ima get *[INDIVIDUAL 1]* to bring you some bread and some clothes , and when she bring it to you, call jaz so she can come get it please sis. I need you to get this handled for me . and I got you. I promise[.]"

20. Based on my training and experience as a narcotics investigator, these communications are highly indicative of drug-related communications. This investigation showed that Burford used thinly-veiled language, such as "joints," "shoes," "blues," or "clothes," to refer to controlled substances. I interpret the messages cited earlier to refer to other individuals (known co-conspirators in the Burford DTO) retrieving controlled substances from CALLOWAY, or bringing controlled substances and money to CALLOWAY, at Burford's behest.

21. Law enforcement also reviewed drug-related text communications between CALLOWAY and INDIVIDUAL 1 on INDIVIDUAL 1's phone. Some examples listed are as follows:

a. On July 12, 2023, INDIVIDUAL 1 wrote to CALLOWAY: "He said did you keep the ones he told you to do up?" CALLOWAY replied, "Yes… I found them[.]" INDIVIDUAL 1 responded: "Bettt . . . . Ima be bringing you some blues to[.]"

b. On July 26, 2024, INDIVIDUAL 1 wrote to CALLOWAY: "Set on the phone he said whats going on[.]" INDIVIDUAL 1 continued, "Shorty been tryna come pick up from you and she said you ain`t answering your phone so he wanted me to call you and 3 way and see what`s up[.]" After CALLOWAY responded,

8

    INDIVIDUAL 1 wrote, "Okay yes she about to come now she live in millwood she said she otw.. she`s coming to get 4 brown shoes she`s not giving you any money either bcus ima pick that up from here when I get off". CALLOWAY replied "Ok i got 3 3.5 & 1 3[.]" INDIVIDUAL 1 asked, "The bags you made up for me what is they on the scale? The little ones," to which CALLOWAY answered, "Yeah she came, they`re 3.5, 4.1 in the bag. The last one is 3.0[.]"

    c. On September 25, 2023, CALLOWAY wrote to INDIVIDUAL 1: "Jaz texted me earlier n said to keep the 100 & she picking up the shoes[.]"

    d. On October 7, 2023, CALLOWAY wrote to INDIVIDUAL 1: "Ok you just getting the blues? & if he call tell him i got his message & i texted Tyler last night n this morning for the cashapp but my text ain`t go through[.]"

22. On October 17, 2024, a federal grand jury charged CALLOWAY and others in a one-count indictment with conspiring to possess with intent to distribute and to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 846. An arrest warrant was subsequently issued and on October 31, 2024, Officer Rippy of the Lynchburg Police Department located CALLOWAY in the parking lot of her apartment at 2075 Langhorne Road and, at my direction, placed her under arrest.

23. Officer Rippy allowed CALLOWAY to retrieve her jacket from within her apartment. Officer Rippy then provided CALLOWAY her *Miranda* rights, and she stated that she understood. CALLOWAY asked the officer for her mother's phone number from her phone and provided Officer Rippy a passcode to retrieve that phone number for her. Officer Rippy contacted me, and I requested that he seize the cellular device upon probable cause that it constituted

evidence of a crime, as discussed below. Officer Rippy vouchered CALLOWAY's Apple iPhone as item #1 with the Lynchburg Police Department under report 2024-016724.

24. On November 1, 2024, I transported CALLOWAY from the Lynchburg Adult Detention Center to Roanoke, Virginia for her initial appearance. DEA Task Force Officer D. Bailey assisted me with the transport. I read CALLOWAY her *Miranda* rights and she acknowledged that she understood. CALLOWAY proceeded to make a number of statements. CALLOWAY denied involvement in the distribution of controlled substances. CALLOWAY also provided a different phone number than what was known to law enforcement, and a number that was different from the communication she had with both Burford and INDIVIDUAL 1. However, CALLOWAY stated that she had a Text Now number in the past and claimed that she did not know what that number was.[2]

25. CALLOWAY identified photographs of INDIVIDUAL 1 and Berger. CALLOWAY informed me that Berger lived in her apartment for approximately two months in 2023. CALLOWAY told me, "There would be like in his room and stuff, I'm not going to lie – like sometimes I would give stuff to people, you know, like money and stuff, they might give me stuff, but it's like as far as counting or trying to like – what I wasn't doing that." CALLOWAY stated that there was a black bag in the room used by Berger. CALLOWAY claimed that she would sometimes be asked to retrieve bags from it, weigh the bags, and then give them to people. CALLOWAY denied knowing what was in the bags. CALLOWAY also stated that Burford would

---

[2] I am aware from previous experience and from publicly-available information that TextNow is a popular mobile application. The app assigns users a phone number and allows them to make phone calls and send text messages associated with that number. *See, e.g.*, TextNow, *Getting Started With TextNow*, https://help.textnow.com/hc/en-us/articles/360043031633-Getting-started-with-TextNow (last visited Nov. 7, 2024).

10

sometimes have her get money from other people to put on Burford's books, or to make FanDuel bets on his behalf. CALLOWAY stated that she sometimes maintained Burford's white car at her residence.

26. CALLOWAY informed me that she changed phone numbers last year. She claimed that her boyfriend purchased her a new phone around Christmas of 2023 because her last phone, (presumably the one she possessed and utilized during the conspiracy) broke. CALLOWAY also indicated that she was in contact with other individuals charged in the drug conspiracy. For example, she stated that she talked to Burford within the last few days of this interview. CALLOWAY also stated that Berger sent her a text message a couple days before, telling CALLOWAY that Berger could not talk to Burford. Berger was arrested on October 25, 2024 date and appeared before this Court on October 28, 2024. CALLOWAY stated she had Berger stored as "Jazz" within her phone contacts.

27. In my investigation, I located an Instagram account which appeared to be CALLOWAY's account because it showed many photographs of CALLOWAY. I noticed a picture dated September 26, 2024 that depicted CALLOWAY sitting inside of a vehicle in a pink shirt. A digital scale could be seen beside her on the center console. I found this to be notable because in my training and experience, digital scales are often used by drug dealers to weigh product in order to apportion the appropriate amounts to their customers.



28.    I showed this photograph (depicted with redactions above) to CALLOWAY, and she acknowledged that it was her in the photograph. When asked about the digital scale, she claimed that she sometimes used a scale to weigh marijuana purchased for personal use. I asked CALLOWAY if I would find any photos of drugs if I searched her phone. CALLOWAY stated no, then added, "unless you find some weed, but that's about it." She then made several conflicting statements about the marijuana, first stating "I don't even think I have that on my phone," then concluding, "well, I might."

29.    The Device is currently in the lawful possession of the Lynchburg Police Department. For the reasons described in this affidavit, it was seized upon probable cause that it contained evidence of the listed crimes.

30.    As demonstrated by the information contained herein, and as the grand jury has already found, there is probable cause that Jakayla CALLOWAY conspired with Burford and others to traffic in fentanyl between February and November 2023. And CALLOWAY stated

that as of November 2024, she was still in contact with other individuals known to be co-conspirators, specifically Jasmine Berger and Tremon Burford.

31. Based on my training and experience, I believe that there is probable cause to believe that CALLOWAY's phone will contain evidence of the listed violations of federal law. To be clear, CALLOWAY indicated after the seizure of her phone that she now has a new phone with a phone number that does not correspond to the phone number she previously used to transact drug business in 2023. However, the Device is an Apple iPhone, and the evidence in my investigation suggests that CALLOWAY also previously used an Apple iPhone.[3] I know that the users of Apple iPhones have access to free cloud storage data via iCloud, and that iPhones can be easily configured to automatically back up data to this platform. I also know that new phones can retrieve backed-up information from iCloud, thereby allowing for the transfer of contacts, text messages, photos, and so on. In fact, a user of a new iPhone is prompted by the device to restore backed-up data before using the phone.[4] And in my experience, and for reasons I describe elsewhere in this affidavit, I know that people frequently restore the contents of their old phones to their new ones for convenience. For that reason, it is likely that evidence of the 2023 conspiracy will be found on CALLOWAY's phone, notwithstanding the fact that it may be a new phone with a new number.

32. Even if CALLOWAY's new phone does not contain backed-up information, there is still reason to believe that it contains evidence of the listed violations, because the new phone

---

[3] Specifically, Green Dot records show that Jakayla Calloway created an Apple Cash account on December 9, 2021, and that she had Apple Pay transactions spanning from 2021 to 2024. I know that these types of accounts are mobile payments associated with iOS-based devices.

[4] *See* Apple Support, *Set Up Your iPhone or iPad*, https://support.apple.com/en-us/105132 (last visited Nov. 8, 2024).

13

likely contains information from 2023 stored in mobile application data, such as social media applications or financial applications. It also likely contains evidence related to her continued involvement in narcotics, especially given CALLOWAY's Instagram post depicting a digital scale, her statements about marijuana, and her continued association with and communication with a co-conspirator, Jasmine Berger.[5]

33. The Device is currently in storage at the Lynchburg Police Department, headquartered at 905 Court Street Lynchburg, VA 24504. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Lynchburg Police Department.

## TECHNICAL TERMS

34. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing

---

[5] CALLOWAY also continues to be in communication with Tremon Burford, although that fact is less incriminating given that these two individuals are related.

    names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. *Digital camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to

15

    store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA*:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer

    software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

  f. *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

  35. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and I know that it can access the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

<b><u>ELECTRONIC STORAGE AND FORENSIC ANALYSIS</u></b>

  36. I also know that digital data has, to a large extent, supplanted physical items that we used to rely on in modern life. Smartphones have replaced important items in everyday life, such as physical calendars; the Rolodex; cameras and photo albums; and even written correspondence. Because people value this and other digital data highly, I know that people frequently maintain their digital data (such as calendar information, contact lists, photos, and text messages) for years.

  37. I am also aware that modern technology and the nature of digital data allows for easy storage and transfer of digital information. For example, files can easily be transferred

between electronic devices using cloud-based storage platforms, such as iCloud, or other free or low-cost platforms, such as Google Drive, Microsoft OneDrive, and so on.

38. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

39. Separate and apart from information stored on electronic devices, I know that Internet-based mobile applications frequently maintain the data of their account users for long periods of time. For example, an individual who uses a financial services application or a social media application could log in to their account on a new device and access their historical account data. Such data can often be retrieved from mobile phones upon forensic analysis.

40. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

41. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

42. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

43.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B. I request the Court issue the proposed search warrant.

Respectfully submitted,

MATTHEW KNABB (Affiliate)
Digitally signed by MATTHEW KNABB (Affiliate)
Date: 2024.11.12 09:48:33 -05'00'

Matthew R. Knabb
Task Force Officer, ATF

Received by reliable electronic means, and subscribed and sworn to me by telephone pursuant to Fed. R. Crim. P. 4.1, this __13th__ day of November, 2024.

_____
Honorable C. Kailani Memmer
UNITED STATES MAGISTRATE JUDGE